# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 11-CV-0326 (JFB) (ETB)

_____

### HILDEGARD PERLMAN,

Plaintiff,

VERSUS

### FIDELITY BROKERAGE SERVICES LLC ET AL.,

Defendants.

_____

**MEMORANDUM AND ORDER**
March 26, 2013

_____

JOSEPH F. BIANCO, District Judge:

Hildegard Perlman ("plaintiff" or "Hildegard") brought this action against Fidelity Brokerage Services LLC, Fidelity Management Trust Company (collectively, "Fidelity"), Ameriprise Financial Services Inc. ("Ameriprise"), Jonathan Blass ("Blass"), as Executor and Trustee under the Last Will and Testament of Norman Perlman, and Wendy Perlman ("Wendy") (collectively, "defendants"), alleging violations of the Employee Retirement Income Security Act of 1975 ("ERISA"), 19 U.S.C. § 1001 *et seq.*, as to the Individual Retirement Account ("IRA") of her late husband, Norman Perlman ("Norman").

Specifically, plaintiff claims that, as the surviving spouse of an ERISA plan participant, she is entitled to assets that she alleges were improperly rolled over into an IRA. Plaintiff asserts that, because she did not provide formal written authorization, the transfer of assets from her late husband's Keogh plan into an IRA was improper under ERISA. Accordingly, she claims that Norman's beneficiary declaration under the IRA (entitling her to one-third of the assets) is invalid, and that she is therefore entitled to all of the assets in the IRA. Plaintiff seeks declaratory judgment affirming that she is entitled to survivorship rights in the IRA, pursuant to Section 205(a) of ERISA.

Presently before the Court are three motions made by defendants: (1) a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and to deposit funds, pursuant to 28 U.S.C. §§ 1335 and 2361, by Ameriprise; (2) a motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and for summary judgment, pursuant to Rule 56, by Fidelity (along with a request that the Court grant Fidelity leave to move for attorneys' fees

and costs pursuant to 29 U.S.C. § 1132(g));
and (3) a motion for summary judgment,
pursuant to Rule 56, and to dismiss,
pursuant to Federal Rule of Civil Procedure
12(b)(7)[1] by Wendy (along with a request
for attorneys' fees and costs pursuant to 29
U.S.C. § 1132(g)).

Because the uncontroverted evidence
shows that ERISA does not govern
Norman's plan and, even if it did, that
plaintiff's ERISA claims would otherwise
be barred by the statute of limitations, the
Court grants summary judgment in favor of
defendants on plaintiff's ERISA claims.
Additionally, because the Internal Revenue
Code ("IRC" or the "Code") provisions cited
by plaintiff do not create a private right of
action for her, to the extent plaintiff is
seeking relief pursuant to the IRC, the Court
grants summary judgment in favor of
defendants. Finally, for the reasons
discussed in detail below, the Court declines
to exercise jurisdiction over Ameriprise's
interpleader counterclaim and cross-claims
and, as such, does not permit Ameriprise to
deposit the IRA proceeds with the Court and
declines to discharge Ameriprise from
liability pursuant to 28 U.S.C. § 2361.

Also before the Court is a cross-motion
for summary judgment made, pursuant to
Rule 56, by plaintiff. Plaintiff requests a
declaratory judgment (pursuant either to
ERISA or, in the alternative, to the
Declaratory Judgment Act) and any other
"make whole" remedies, including legal
fees, which the Court deems appropriate.
However, as discussed in detail below,
because plaintiff has no federal claim that

survives summary judgment, she cannot
maintain an action for a declaratory
judgment. Accordingly, the Court denies
plaintiff's cross-motion for summary
judgment in its entirety.

Additionally, the Court declines to
exercise supplemental jurisdiction over any
remaining state law claims and, in its
discretion, declines to award attorney's fees
and costs to any party in this litigation.

I. BACKGROUND

A. Factual Background

The Court has taken the facts set forth
below from the parties' depositions,
affidavits, exhibits, and respective Rule 56.1
Statements of Facts. Upon consideration of a
motion for summary judgment, the Court
shall construe the facts in the light most
favorable to the non-moving party. *See
Capobianco v. City of New York*, 422 F.3d
47, 50 (2d Cir. 2005). Unless otherwise
noted, where a party's 56.1 statement is
cited, that fact is undisputed or the opposing
party has not pointed to any evidence in the
record to contradict it.[2]

Hildegard and Norman were married on
June 3, 2011. (Pl.'s Ameriprise 56.1 ¶ 1.)
They resided together in Woodmere, New
York. (Ameriprise 56.1 ¶ 2.) Defendant
Wendy Sue Perlman is Norman's daughter
from a previous marriage. (*See* Wendy
Perlman 56.1 ("Wendy 56.1") ¶ 8.) In 2001,
before they married, Norman and Hildegard
entered into a prenuptial agreement.
(Fidelity 56.1 ¶ 6.)[3] Approximately two

---

[1] Because the Court, as discussed *infra*, grants
Wendy's motion pursuant to Federal Rule of Civil
Procedure 56, the Court does not address Wendy's
motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(7) for failure to join an indispensable
party.

[2] Although the parties' Rule 56.1 statements contain
specific citations to the record, the Court cites to the
Rule 56.1 statements, rather than to the underlying
citations.
[3] Plaintiff repeatedly highlights a particular portion of
this agreement: under the prenuptial agreement,

years after they were married (on approximately June 10, 2003), Norman set up a Money Purchase Pension Plan Keogh account and plan (the "Keogh account" and the "Keogh plan"), which were maintained by Fidelity. (Ameriprise 56.1 ¶ 3; Wendy 56.1 ¶ 3.)

In the Koegh plan documents, Norman listed himself as the sole employer and sole plan administrator. (Ameriprise 56.1 ¶ 4.) Norman also listed himself, and no others, as a participant in the Keogh plan. (*Id.* ¶ 5.) According to Brian Hogan, Director of Retirement Product Management for Fidelity, a search was conducted during the pendency of this action to determine whether there were participants in the Keogh plan other than Norman; no evidence of other participants was found. (*Id.* ¶ 6.) Discovery in this action has similarly failed to produce any evidence of participants other than Norman (*id.* ¶ 7), and Hildegard acknowledged, at her deposition, that she herself was unaware of any additional participants in the Keogh plan (*id.* ¶ 8.) Additionally, Norman signed his own name in the section titled, "Spousal Consent," above the line labeled, "Signature of Participant's Spouse." (Pl.'s Ameriprise 56.1 ¶ 4; *see* Decl. of Rachel Nicotra in Opp'n to Defs.' Summ. J. Mots. and in

Supp. of Pl.'s Cross Mot. for Summ. J. ("Nicotra Decl.") Ex. A, at 5.[4])

At all times relevant to this action, Norman was an attorney. (Wendy Perlman 56.1 ¶ 2.) In his Keogh plan documents, as noted above, Norman identified himself as his own employer. (*Id.* ¶ 4.) Indeed, in a letter dated September 9, 2000, Norman explicitly references the "solo practitioner practice" of his that he handed over to his son eight years earlier, as well as the fact that, although he worked in the same office as his son following the transfer, he remained "totally independent." (Nicotra Decl. Ex. Y, at 4.) During his legal career, Norman had a professional relationship with Robert D. Rosen ("Rosen") – a relationship that Norman described as "essentially a two man partnership presented to the world as a solo practice in his name with my own inclusion as trial counsel." (*Id.*) Norman believed that "upon [his] retirement or disability [his son] and Robert (Rosen) will undoubtedly form a conventional partnership." (*Id.*) At his deposition, Rosen testified that his relationship with Norman began in about 1992, and that virtually all of the cases he handled were referred to him by Norman. (Nicotra Decl. Ex. DD, Dep. of Robert D. Rosen ("Rosen Dep.") at 14-15.) When asked about his fee sharing arrangement with Norman, Rosen testified that it was "50/50." (*Id.* at 15.) This professional relationship between Norman and Rosen continued until approximately 2007, when Norman acted as trial counsel on one of Rosen's cases for the final time. (*Id.* at 33-34.)

---

Norman agreed to fund his trust with at least three million dollars, and further agreed that in the event the trust was not timely funded, plaintiff would have a claim against his estate for the greater of one million dollars or plaintiff's elective share. (*See* Pl.'s Wendy 56.1 ¶ 13 (citing relevant provision of the prenuptial agreement).) Plaintiff claims that, because Norman did not fund his trust with three million dollars as required under the prenuptial agreement, she has a claim against his estate in the amount of one million dollars. (*See* Pl.'s Wendy 56.1 ¶ 18.)

---

[4] All exhibits attached to the Nicotra Declaration are paginated with Bates-stamped numbers (the numbers used during document production between the parties in discovery). For ease of reference, the Court refers to the pages of these exhibits by the page numbers assigned by ECF.

While they were married, Norman and Hildegard filed joint tax returns, including a Self Employment Tax Schedule SE and/or Schedule C reflecting Norman's self employment. (Wendy 56.1 ¶ 5.) Hildegard states, however, that in 2007, one year prior to Norman's death, she began filing individual tax returns. (Pl.'s Decl. in Opp'n to Summ. J. ¶ 12.)

Fidelity managed Norman's Keogh plan from December 2004 to January 2007. (Fidelity 56.1 ¶ 1.) On or about January 22, 2007, Norman sought to transfer all of the assets from his Keogh plan to an IRA maintained by Ameriprise. (Ameriprise 56.1 ¶ 10.) Whether or not Hildegard knew that the type of plan was changing during this transfer, she knew that Norman's funds were in fact being transferred from Fidelity to Ameriprise before that transfer occurred. (Fidelity 56.1 ¶ 3; *see also* Wendy 56.1 ¶ 10 (citing Hildegard deposition testimony about an Ameriprise representative coming to her home sometime in January 2007 before the transfer to discuss the transfer).) In fact, at her deposition, Hildegard recalled that Norman had asked for her permission to conduct such a transfer. (Decl. of Virginia T. Shea in Supp. of Ameriprise's Mot. for Summ. J. and to Interplead Funds ("Shea Decl.") Ex A., Dep. of Hildegard Perlman ("Hildegard Dep.") at 103 ("Q. Did Norman ever ask for your permission to transfer the assets from the Fidelity account to Ameriprise? A. I remember signing something, a spousal consent. . . . Q. Have you ever seen a copy of that document? A. No. Q. But you believe that you signed it? A. I believe so.").)[5] Indeed, Hildegard

recalled signing "a spousal consent" regarding the transfer (*id.*), although she testified that she did not read the form, nor did anyone explain it to her before she signed it (*id.* at 105). To date, no written spousal consent to the transfer of funds signed by Hildegard has been produced by any party. (Ameriprise 56.1 ¶ 16.) Fidelity transferred Norman's funds from the Keogh account to Ameriprise on or about January 31, 2007. (*Id.* ¶ 11.) When the account was transferred, it was deposited into an IRA. (*See* Wendy 56.1 ¶ 12.)

Norman executed his will on February 5, 2007. (*Id.* ¶ 13.) He established a living trust that same day, which provides that, upon Norman's death, the income from managing, investing, and reinvesting all trust property shall be paid one-third to Hildegard and two-thirds to Wendy for as long as Hildegard is living. (*Id.*) Similarly, according to the IRA Designation of Beneficiary for the IRA held by Ameriprise, Norman named "the trust under my last will

_____

Fidelity account to the Ameriprise IRA account? . . . A. No, not really." (Hildegard Dep. at 104.) However, plaintiff fails to acknowledge the line of questioning that immediately follows, through which defense counsel attempted to reconcile plaintiff's testimony about signing a spousal consent and her testimony about not consenting to the transfer:

> Q. Why do you say 'not really,' particularly if you just told me you believe you signed a spousal consent? A. Because you're asking me if – would you rephrase – repeat the question. Q. Did you either in writing or orally consent or agree to Norman's transfer of the assets from the Fidelity account to the Ameriprise IRA? A. By signing the spousal consent, which I think that's what it was, I would say yes.

(*Id.*) Accordingly, the uncontroverted evidence shows that, by signing the spousal consent form, Hildegard agreed to the transfer before it occurred.

_____

[5] Plaintiff contends that, despite this testimony, she did not "consent" to the transfer of the assets from Fidelity to Ameriprise. (Pl.'s Ameriprise 56.1 ¶ 12.) In support of this contention, plaintiff cites the following testimony from her deposition: "Q. Did you consent to the transfer of the assets from the

and testament for Hildegard Perlman (wife)" as the beneficiary of 33.3% of the IRA. and "the trust under my last will and testament for Wendy Perlman (daughter)" as the beneficiary of 66.6% of the IRA. (Ameriprise 56.1 ¶ 17.)

Norman passed away in August of 2010. (Fidelity 56.1 ¶ 8.) Following his death, Wendy filed a petition in the Surrogate's Court, Nassau County, regarding Norman's account. (*Id.*; *see also* Shea Decl. Ex. I, Order to Show Cause.) On November 10, 2010, Hildegard filed a motion to dismiss that petition for lack of subject matter jurisdiction, alleging that "federal courts have exclusive jurisdiction over the matter because she asserts an ERISA claim based on her alleged right to those benefits under ERISA as Norman's surviving spouse." (Fidelity 56.1 ¶ 9.) Upon application, on March 9, 2011, Blass was appointed trustee of the trust created by Norman's will. (*See* Decl. of Elizaveta S. Korotkova in Supp. of Wendy Perlman's Mot. for Summ. J. ("ESK Decl.") Ex 16, Mar. 9, 2011 Surrogate Court, Nassau County, Order for Appointment of Trustee.) On December 13, 2011, the Surrogate's Court, Nassau County, denied Hildegard's motion to dismiss. It also deferred Wendy's petition (for limited letters of administration, so that she can represent the interests of the estate in the federal action, and for denial of letters of trusteeship to Blass, because he allegedly has a conflict of interest, has demonstrated hostility to petitioner, and has failed to vigorously defend the estate's position in the federal action) pending this Court's determination of whether Blass will properly represent the interests of Norman's estate and trust in the federal action. (*See* ESK Decl. Ex. 17, Dec. 13, 2011 Surrogate Court, Nassau County, Order.)

In bringing this lawsuit, Hildegard seeks *all* assets in the account held by Ameriprise, attorney's fees, and "such other legal or equitable relief as this Court deems appropriate." (Pl.'s Fidelity 56.1 ¶ 10.) Wendy seeks what she contends is her two-thirds interest in the income from the proceeds. (Ameriprise 56.1 ¶ 21.) She also seeks a determination, by this Court, that Blass is not fit to serve as trustee over the trust created under the last will and testament of Norman. (*See* Wendy's Answer to Second Am. Compl. ¶¶ 16-18 (cross-claim against Blass for declaratory judgment that Blass lacks standing to defend the testamentary trust).) The value of the proceeds in the IRA account has at all times exceeded $500.00. (*Id.* ¶ 22.)

### B.  Procedural History

Plaintiff filed the complaint in this action on January 21, 2011. Plaintiff then filed an amended complaint on February 23, 2011. Blass filed an answer to the amended complaint on March 10, 2011, as did Fidelity Brokerage on March 21, 2011. On April 8, 2011, Ameriprise filed an answer to plaintiff's amended complaint and asserted a cross-claim against Blass, as well as a counterclaim against plaintiff, for interpleader. Blass filed an answer to Ameriprise's cross-claim on April 26, 2011.

On May 9, 2011, Wendy filed a motion to intervene in the action. Blass filed an opposition to this motion on June 30, 2011, and Wendy filed a reply in further support of her motion to intervene on July 14, 2011. On October 21, 2011, a stipulation was filed wherein the parties agreed to the filing of plaintiff's proposed second amended complaint (to add Wendy as a defendant and to add certain provisions of the IRC to the provisions of ERISA already cited in the first amended complaint).

5

On October 21, 2011, plaintiff filed her second amended complaint. On December 2, 2011, Fidelity and Blass filed separate answers to plaintiff's second amended complaint, and Ameriprise filed an answer and cross-claim against Blass and Wendy, as well as a counterclaim against plaintiff, for interpleader. On December 7, 2011, Wendy filed an answer to the second amended complaint. She also filed cross-claims against Blass for breach of fiduciary duty and a declaratory judgment that Blass lacks standing to defend the testamentary trust created under the last will and testament of Norman, as well as a counterclaim for breach of contract against plaintiff. Plaintiff filed an answer to Ameriprise's counterclaim on December 23, 2011, as well as an answer to Wendy Perlman's counterclaim. Blass filed an answer to Ameriprise's cross-claim on December 26, 2011, and an answer to Wendy Perlman's cross-claims on December 27, 2011. The case then proceeded to discovery under the direction of Magistrate Judge E. Thomas Boyle.

On July 16, 2012, Ameriprise filed a motion for summary judgment and to deposit funds, Fidelity filed a motion for judgment on the pleadings and for summary judgment, and Wendy Perlman filed a motion for summary judgment and motion to dismiss. On September 14, 2012, plaintiff filed an opposition to all three motions for summary judgment and a cross-motion for summary judgment. On October 12, 2012, Fidelity filed a reply in further support of its motion for judgment on the pleadings and for summary judgment and in opposition to plaintiff's cross-motion for summary judgment. Also on October 12, 2012, Ameriprise filed a reply in further support of its motion for summary judgment and in opposition to plaintiff's cross-motion for summary judgment. Finally, on October

12, 2012, Wendy Perlman filed a reply in support of her motion for summary judgment and motion to dismiss and in opposition to plaintiff's cross-motion. Plaintiff filed a reply in further support of her cross-motion for summary judgment on November 13, 2012. Oral argument was held on December 3, 2012. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6] The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

---

[6] Because the Court has relied, at least in part, on deposition excerpts and other exhibits submitted by the parties in conjunction with their moving papers, the Court treats Fidelity's motion for judgment on the pleadings and for summary judgment solely as a motion for summary judgment. Accordingly, the standard for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), governs the Court's review of Fidelity's motion.

evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth*

*Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

#### A. Plaintiff's Request for Declaratory Relief Pursuant to ERISA

Plaintiff seeks declaratory relief pursuant to Section 502(a)(3)(B) of ERISA, "stating that, as the plan participant's surviving spouse, she is entitled to the assets presently and improperly maintained in the rollover IRA." (Pl.'s Second Am. Compl. ¶ 26.) Additionally, plaintiff seeks injunctive relief preventing Ameriprise from distributing the assets maintained in the IRA to anyone other than plaintiff. (*Id.* ¶ 39.) As to these ERISA claims, defendants argue that (1) Title I of ERISA does not govern Norman's Keogh plan, and (2) even if ERISA applied, plaintiff's claims are time-barred by the applicable statute of limitations. As set forth in detail below, the uncontroverted evidence shows that Norman's plan is not an ERISA plan and, accordingly, ERISA cannot provide the relief plaintiff seeks. Moreover, even assuming *arguendo* that ERISA applies, plaintiff's ERISA-related claims are untimely. Summary judgment on plaintiff's ERISA claims is, therefore, granted in defendants' favor.

#### 1. Whether Norman's Keogh Plan is Governed by ERISA

ERISA was enacted to "'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal Courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)

7

(quoting 29 U.S.C. § 1001(b)) (alteration in original). Accordingly, pursuant to Section 502(a)(1)(B) of ERISA, "a civil action may be brought – (1) by a participant or beneficiary - . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of plan." 29 U.S.C. § 1132(a)(1)(B).

However, Title I of ERISA applies only to an "employee benefit plan." *Id.* § 1003(a). Under the Act, an "employee benefit plan" is defined as "any plan . . . established or maintained by an employer . . . [that] (i) provides retirement income to *employees*, or (ii) results in a deferral of income by *employees* for periods extending to the termination of covered employment or beyond." *Id.* § 1002(2)(A) (emphasis added). The term, "employee," is defined by the statute as "any individual employed by an employer." *Id.* § 1002(6).

One year after Title I was enacted, the Department of Labor ("DOL") issued regulations that further clarify the definition of "employee benefit plan." *See Schwartz v. Gordon*, 761 F.2d 864, 867 (2d Cir. 1985) (explaining that, in 1975, the "Secretary of Labor promulgated regulations pursuant to Congress' express delegation of [ERISA] rule-making authority to him"). The regulations provide:

(b) Plans without employees. For purposes of Title I of the Act and this chapter, the term "employee benefit plan" *shall not include any plan, fund or program*, other than an apprenticeship or other training program, *under which no employees are participants covered under the plan as defined in paragraph (d) of this section*. For example, a so-called

"Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under Title I. However, a Keogh plan under which one or more common law employees, in addition to the self-employed individuals are participants covered under the plan, will be covered under Title I.

29 C.F.R. § 2510.3-3(b) (emphasis added). Thus, the DOL explicitly excluded from ERISA's coverage benefit plans maintained by self-employed individuals that do not cover any employees.

Indeed, in *Schwartz*, 761 F.2d 864, the Second Circuit reiterated this exclusion. In *Schwartz*, a case involving the Keogh retirement plan of a self-employed physician, the Second Circuit adopted the DOL's definition of "employee benefit plan" and, accordingly, held that a Keogh retirement plan maintained by a self-employed individual who is the sole contributor to and beneficiary of the account is not subject to Title I of ERISA. *Id.* at 865-66 (affirming district court's grant of summary judgment on the basis that the account in question "did not meet the definition of an 'employee benefit plan' found in Title I of ERISA and that therefore the fiduciary duties imposed by Title I upon the managers of such plans did not apply"). In expounding on the purpose for the distinction between benefit plans that cover employees and those that do not for purposes of ERISA, the Second Circuit explained the following:

A self-employed individual who voluntarily decides to set aside a portion of his income for his own retirement, unlike a worker employed by another, has complete

8

control over the amount, investment and form of the fund created by him for his retirement. The remedial scheme established by Title I for workers employed by others was therefore not necessary for the protection of self-employed persons, and Congress accordingly has not changed the definition of "employee" in that Title to include self-employed persons.

*Id.* at 868; *see also In re Lowenschuss*, 171 F.3d 673, 680-81 (9th Cir. 1999) (explaining that "self-employed owners of companies that sponsor pension plans were deliberately excluded from ERISA's protections because these individuals can protect their own beneficial interests in the plans"); *Slamen v. Paul Revere Life Ins. Co.*, 166 F.3d 1102, 1105-06 (11th Cir. 1999) ("ERISA excludes employer benefit plans from its broad scope because when the employee and employer are one and the same, there is little need to regulate plan administration." (citation and internal quotation marks omitted)).

Norman's plan, like the plan at issue in *Schwartz*, is of the type excluded from ERISA's coverage. Norman listed himself as the sole employer in his Keogh plan documents (Ameriprise 56.1 ¶ 4; Wendy 56.1 ¶ 4), and as self-employed on his tax returns (*see* Wendy 56.1 ¶ 5 (stating that Norman filed a "Self Employment Tax Schedule SE and/or Schedule C reflecting Norman's self employment during all times relevant to this lawsuit")). In his plan documents, Norman also listed himself as a participant in the plan. (Ameriprise 56.1 ¶ 5.) Since Norman, as the employer who established the plan, was also covered by the plan, he is not an "employee" as defined by Title I of ERISA (he is self-employed, and

not an "individual employed by an employer"). 29 U.S.C. § 1002(6).[7]

Thus, in order for ERISA to apply, one or more employees would also need to be participants in Norman's plan. However, based on the evidence in the record, no rational fact finder could conclude that there were participants in the plan other than Norman. First, on the plan documents, Norman listed himself, and no others, as a participant. (Ameriprise 56.1 ¶ 5.) Second, a search conducted by Fidelity during the pendency of this action has produced no evidence of participants in the plan other than Norman (*id.* ¶ 6), and discovery in this action has similarly failed to produce evidence of any additional participants (*id.* ¶ 7). Finally, plaintiff herself acknowledged that she was unaware of any additional participants in Norman's plan. (*Id.* ¶ 8.) The fact that no employees were actually covered by the plan indicates that, in establishing his Keogh plan, Norman was seeking to create a personal retirement fund, not to provide benefits for any employees. *See Rand*, 49 F. Supp. 2d at 118 (remanding case to state court after determining that the disability insurance policies at issue were not part of an employee welfare benefit plan pursuant to ERISA, as they "were for the sole interest and benefit of the plaintiff, and not his employees"); *see also Slamen*, 166 F.3d at 1105 ("Slamen's disability insurance policy covered only himself. No employees

---

[7] The Court notes that plaintiff's allegation that Norman and Rosen maintained an "essential partnership" does not change this analysis. *See Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404, 407 (9th Cir. 1995) ("Neither an owner of a business nor a partner in a partnership can constitute an 'employee' for purposes of determining the existence of an ERISA plan."); *Rand v. Equitable Life Assur. Soc'y of the U.S.*, 49 F. Supp. 2d 111, 118 (E.D.N.Y. 1999) (explaining that plaintiff's partner "cannot be considered an employee for purposes of determining whether ERISA is applicable").

received any benefits under the plan. . . . Slamen's disability insurance policy . . . is not, by its terms, an ERISA plan . . . ."). It is quite clear that, under the reasoning of *Schwartz*, such a plan falls outside of ERISA's scope.[8]

As discussed above, the DOL's regulations explicitly exclude benefit plans with no employee participants from ERISA's coverage, and this Court is not in a position to disturb the DOL's judgment. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."); *Prince v. Am. Airlines, Inc.*, 97 Civ. 7231 (RWS), 1999 U.S. Dist. LEXIS 15550, at *19 (S.D.N.Y. Oct. 6, 1999) ("[W]here an agency is vested with policy-making power, as the DOL is with respect to Title I of ERISA, a court cannot substitute its judgment for that of the agency."). Further, both the Supreme Court and the Second Circuit have already considered and deferred to the DOL on this issue. *See Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 21 (2004) ("Plans that cover only sole owners or partners and their spouses, the regulation instructs, fall outside Title I's domain. Plans covering working owners *and* their nonowner employees, on the other hand, fall entirely within ERISA's compass." (footnotes omitted)); *Schwartz*, 761 F.2d at 869 (finding DOL's interpretation reasonable and explaining that

"exclude[d] from Title I coverage [are] those plans, such as [plaintiff's], in which there are *no* employees and for which the fiduciary protections afforded by the Act are accordingly least important"). Thus, the law and precedent are clear that, when self-employed individuals like Norman open retirement accounts that do not cover any employees, those accounts are not governed by Title I of ERISA.

Hildegard argues, however, that because Norman was a member of an "affiliated service group," as that term is defined in Section 414(m) of the IRC, his Keogh plan may nevertheless be subject to ERISA. (*See* Pl.'s Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. and in Supp. of Pl.'s Cross Mot. for Summ. J. ("Pl.'s Opp'n & Cross Mot.") at 10.) Essentially, plaintiff's argument is that the definition of "affiliated service group" used to determine whether one qualifies for favorable tax treatment under the Code should also be used to determine whether one's plan is subject to ERISA, and that because Norman was part of an "affiliated service group," as defined by the Code, his Keogh plan is governed by ERISA. Putting aside the question of whether Norman was in fact part of an "affiliated service group," there is simply no authority to support plaintiff's argument that a definition in the Code used for tax purposes should be used to determine whether a plan falls within the ambit of ERISA.[9]

---

[8] The Court notes that, in her opposition papers, plaintiff fails to even address, let alone distinguish, *Schwartz*, 761 F.2d 864.

---

[9] Indeed, when asked at oral argument whether there are any cases or authority to support this argument, plaintiff's counsel responded, "There aren't many cases that deal with this issue, to be totally honest here." (Oral Arg. Dec. 3, 2012.) Plaintiff's counsel further stated that "in terms of facts necessary to establish an affiliated service group under ERISA,

Instead, the case law makes clear that these provisions of the Code do not alter ERISA's requirements. *See, e.g.*, *West v. Clarke Murphy, Jr. Self Employed Pension Plan*, 99 F.3d 166, 169 (4th Cir. 1996) ("For tax purposes, § 414(m) expands the scope of the term employer by defining affiliated service groups. These provisions of the Tax Code, however, do not vary ERISA's definition of participant or its requirement of an employer-employee relationship. . . . Employee status under ERISA is determined not by the tax code but by the common law of agency." (citations omitted)); *see also Stamper v. Total Petroleum, Inc. Ret. Plan*, 188 F.3d 1233, 1238-39 (9th Cir. 1999) ("In light of the Supreme Court's observation that 'ERISA is a comprehensive and reticulated statute, which Congress adopted after careful study of private retirement pension plans,'" *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981) (quotation and citation omitted), we believe it would be improper to read into ERISA a requirement Congress elected to apply only to the Tax Code."); *Reklau v. Merchants Nat'l Corp.*, 808 F.2d 628, 631 (7th Cir. 1986) ("We are convinced that had Congress intended that § 401 of the I.R.C. be applicable to ERISA, it would have so stated in clear and unambiguous language as it did in 29 U.S.C. § 1202(c) with §§ 410(a), 411 and 412 of the I.R.C. We thus refuse to read § 401(a) of the I.R.C. as applicable to ERISA." (footnote omitted)). Said another way, whether or not Norman was a member of an "affiliated service group," as the Code defines that term, has no bearing on the ERISA inquiry. Thus, even if Norman was a member of an "affiliated service group" under the Code, for the reasons discussed *supra*, his Keogh plan is not an ERISA plan.

Plaintiff also seems to contend that, because the Keogh plan documents include spousal consent language consistent with ERISA, the plan must be governed by ERISA. (*See* Pl.'s Opp'n & Cross Mot. at 9.) However, spousal consent language does not turn a plan that is otherwise not subject to ERISA into an ERISA-governed plan. Thus, the mere presence of spousal consent language in plan documents does not render a Keogh plan established for, and by, a single, self-employed participant – a plan that would otherwise fall outside of ERISA's scope – subject to ERISA.[10]

Because the uncontroverted evidence shows that Norman's benefit plan did not cover any "employees" as defined by Title I of ERISA, it is not an "employee benefit plan" within the meaning of the Act. Accordingly, ERISA does not govern Norman's Keogh account and plaintiff, in seeking relief pursuant to ERISA, has therefore failed to state a claim upon which relief may be granted.[11]

---

[10] In fact, one of the cases plaintiff cites in support of this argument is completely devoid of any reference to ERISA, *see Edelman v. Smith Barney Inc.*, 55 F. Supp. 2d 218 (S.D.N.Y. 1999), and the other two cases she cites are distinguishable because they did not involve plans established for self-employed individuals, *see Hagwood v. Newton*, 282 F.3d 285 (4th Cir. 2002); *Boulet v. Fluor Corp.*, Civ. No. H-05-0105, 2005 U.S. Dist. LEXIS 29973 (S.D. Tex. Oct. 31, 2005).

[11] "When a claim allegedly based on a federal statute must be dismissed because of the statute's inapplicability to the facts alleged, the dismissal is sometimes described as jurisdictional." *Schwartz*, 761 F.2d at 867 n.4. However, when, as here, the "complaint invokes federal jurisdiction to determine the statute's applicability then, unless the question is insubstantial and frivolous, the dismissal is more accurately described as based on failure to state a claim upon which relief may be granted." *Id.*

---

there are no cases directly on point about those facts." (*Id.*)

2.   Whether Plaintiff's Claims Are Timely if ERISA Applies

Even assuming *arguendo* that Norman's plan is an ERISA plan, plaintiff's claims brought pursuant to ERISA would be barred by the applicable statute of limitations.

Claims asserting a breach of fiduciary duty under ERISA must be commenced after the earlier of:

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. As a preliminary matter, plaintiff does not assert, nor could she credibly contend, that defendants "ma[de] a knowing misrepresentation or omission of a material fact" or "engaged in acts to hinder the discovery of a breach of fiduciary duty" when they effectuated the transfer of Norman's Keogh plan. *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 190 (2d Cir. 2001). Accordingly, the limitations period for fraud or concealment cases is not applicable here.

Plaintiff's argument that a six-year, rather than a three-year, statute of limitations should govern is without merit and, in the Court's view, is based on a misreading of Second Circuit precedent. In *Caputo v. Pfizer, Inc.*, the Second Circuit, for the first time, defined the concept of "actual knowledge of the breach or violation" within the meaning of ERISA. 267 F.3d at 193. The Second Circuit held that a plaintiff has "actual knowledge of the breach or violation" when "he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Id.* (citing *Maher v. Strachan Shipping Co.*, 68 F.3d 951, 954 (5th Cir. 1995) and *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992)). Thus, a plaintiff "must have knowledge of all *facts* necessary to constitute a claim" to satisfy the "actual knowledge" requirement. *Id.* (emphasis added). However, she "need not have knowledge of the relevant law." *Id.*

Hildegard's claim is that defendants allegedly "breached their fiduciary obligations when, in January 2007, [they] transferred all of the assets of the Keogh account to an Ameriprise IRA account without obtaining the requisite spousal consent." (Pl.'s Opp'n & Cross Mot. at 29.) Under *Caputo* then, Hildegard obtained "actual knowledge" of the alleged breach when she had knowledge of all the facts necessary to constitute this claim – *i.e.*, when she knew that Norman's assets had been transferred without her consent. It is undisputed that Hildegard was not only aware of, but also agreed to, the transfer of assets in Norman's account with Fidelity to Ameriprise on or about January 22, 2007. (Fidelity 56.1 ¶ 3; *see also* Wendy 56.1 ¶ 10; Hildegard Dep. at 103.) In addition, because the "spousal consent" at issue for this claim is *Hildegard's* consent, it is uncontroverted that Hildegard would have known whether or not she consented to the transfer by the

time that transfer was effectuated.[12] Thus, the uncontroverted evidence shows that Hildegard had knowledge of all facts necessary to constitute her breach of fiduciary claim by January 22, 2007.

Hildegard's argument for a six-year statute of limitations is that, although she was made aware of the transfer, and may even have consented to it before it occurred, she did not understand the implications of that transfer and, therefore, did not have "actual knowledge" of the alleged breach. (*See* Pl.'s Opp'n & Cross Mot. at 29-30; *see also* Oral Arg. Dec. 3, 2012.) However, as discussed *supra*, in *Caputo* the Second Circuit makes clear that a plaintiff need not have knowledge of the relevant law to have "actual knowledge" for purposes of ascertaining the limitations period. *Caputo*, 267 F.3d at 193. Thus, for purposes of the statute of limitations inquiry, it is no matter that Hildegard may not have understood what effect the transfer of Norman's assets from Fidelity to Ameriprise would ultimately have on her survivorship rights. Instead, to have "actual knowledge," a plaintiff need only have knowledge of all material facts necessary to constitute a claim, *id.*, which, for the reasons discussed above, Hildegard acquired on or about January 22, 2007, if not before.

The Court recognizes that, in *Caputo*, the Second Circuit found that the plaintiff did not have "actual knowledge" on the date cited by the district court because, at that point, he only had "constructive knowledge" of the alleged breach. *Id.* at 194 (explaining

that "constructive knowledge" does not satisfy ERISA's statute of limitations requirement). Hildegard cites this in her opposition papers as support for her argument that she could not have had "actual knowledge" of defendants' alleged breach at the point of transfer. (*See* Pl.'s Opp'n & Cross Mot. at 30.) However, this contention is erroneous because plaintiff's situation is distinguishable from that of the plaintiffs in *Caputo*.

The alleged breach of fiduciary duty at issue in *Caputo* was an employer misrepresenting facts about plaintiffs' pension benefits. *Caputo*, 267 F.3d at 193-94. The Second Circuit explained that the plaintiffs could not have had "actual knowledge" of the breach at the time that their employer first provided the information, for it was not until later that they learned new facts which led them to believe that their employer's prior representations had been false. *Id.* at 194. Accordingly, the Second Circuit stated, "the disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of an underlying breach." *Id.* at 193 (alterations, citations, and internal quotation marks omitted); *see also Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985) (explaining that, because forms required to be filed with the Department of Labor do not require information, nor was any provided in this case, about whether or not the fiduciary duty of independent investigation and evaluation of a plan's investments was fulfilled, the forms cannot, standing alone, constitute knowledge of a breach of that duty). That is simply not the case here, as it is undisputed that Hildegard had knowledge of both the fact of the transfer and whether or not she had consented to it. Thus, Hildegard had "actual knowledge of the breach" to trigger the

---

[12] In fact, at her deposition, Hildegard testified that she remembers signing a "spousal consent" for the transfer *before* it occurred. (Hildegard Dep. at 103.) Although no signed document has turned up during discovery, it is uncontroverted that Hildegard would know whether or not she had given "spousal consent" to the transfer by the time the transfer was made.

three-year statute of limitations period at the point when the transfer was effectuated.

Accordingly, the three-year statute of limitations governs this action and plaintiff, in filing her complaint nearly four years after she obtained "actual knowledge" of the alleged breach, is untimely even if ERISA applies.

\* \* \*

In sum, Norman's plan is not one that ERISA governs and, even assuming *arguendo* that it was an ERISA plan, plaintiff's ERISA claims would be barred by the statute of limitations. For these reasons, plaintiff's ERISA-related claims must fail, and summary judgment is granted in defendants' favor.

### B.  Plaintiff's Request for Relief Under the Internal Revenue Code

Although the claims for relief enumerated in plaintiff's second amended complaint are not made pursuant to the IRC (rather, plaintiff's three causes of action explicitly reference sections of ERISA), plaintiff alleges, in her opposition papers, that she "brings her claim in federal court specifically asserting a violation of Section 417(a)(2) of the Code (which parallels ERISA § 205)." (Pl.'s Opp'n & Cross Mot. at 12.) To the extent plaintiff attempts to bring a claim under the IRC, that claim must fail, as plaintiff has no private right of action under the IRC. *See e.g.*, *Wiesner v. Romo Paper Prods. Corp. Emps. Ret. Plan*, 514 F. Supp. 289, 291 n.2 (E.D.N.Y. 1981) ("The [IRC] sections relied on, 26 U.S.C. §§ 401, 404 and 503, do not create a substantive right that a beneficiary, participant or fiduciary could enforce.").

The sections of the IRC plaintiff points to, Sections 401 and 417, relate solely to tax qualification. Section 401 deals with obtaining tax deferred status of contributions to a plan, and Section 417 provides definitions and special rules for purposes of minimum survivor annuity requirements. However, these sections do not create a private right of action for Hildegard. *See e.g.*, *Suozzo v. Bergreen*, 00 Civ. 9649 (JGK), 2002 U.S. Dist. LEXIS 25563, at *4 (S.D.N.Y. Feb. 5, 2003) ("[T]here is no private right of action for an alleged violation of Section 401, and thus the plaintiff has no claim based on the alleged failure of the Plan to comply with Section 401 [of the IRC]."); *see also Cowan v. Keystone Emp. Profit Sharing Fund*, 586 F.2d 888, 890 n.3 (1st Cir. 1978) ("[Plaintiff] has also argued that he has a cause of action under I.R.C. § 401. . . . This section does not appear to create any substantive rights that a beneficiary of a qualified retirement trust can enforce."); *Beiliang Loh v. Richardson-Browne*, Civ. No. 10-0054(NLH), 2010 U.S. Dist. LEXIS 128016, at *9 (D.N.J. Dec. 2, 2010) ("Section 401 of the IRS Code does not grant Plaintiff a private cause of action . . . ."); *Hall v. Nat'l R.R. Passenger Corp.*, 559 F. Supp. 2d 38, 54-55 (D.D.C. 2008) (explaining that "no private cause of action arises under I.R.C. § 401").

Moreover, as stated in Wendy's reply papers, "IRC § 417(a) does not address any substantive right Hildegard may have but rather, at most, relates to Norman's tax liability or his right to defer reporting income for contributions to the plan not in issue in this action," and "[n]othing in the pleadings suggests that Hildegard's claim is dependent on, or even related to, the qualification of Norman's contributions to the account for tax deferment purposes." (Reply Mem. of Law in Supp. of Wendy

14

Perlman's Mot. for Summ. J. & in Opp'n to Pl.'s Cross Mot. at 5.) Accordingly, any claims based on these IRC sections cannot survive summary judgment.

### C.  Plaintiff's Cross-Motion for Summary Judgment

Hildegard's cross-motion for summary judgment seeks declaratory relief pursuant to ERISA or, in the event the Court finds that ERISA does not apply, pursuant to 28 U.S.C. § 2201. (*See* Pl.'s Opp'n & Cross Mot. at 34-37.)

For the reasons discussed *supra*, Hildegard is not entitled to relief pursuant to ERISA. Thus, Hildegard's cross-motion for summary judgment is essentially a request that the Court declare her to be the proper beneficiary of Norman's IRA assets. However, because Hildegard has no underlying federal cause of action (as discussed *supra*, her ERISA claims cannot survive summary judgment, and she has no cause of action under the IRC), she cannot maintain an action for a declaratory judgment. *See Springfield Hosp. v. Hofmann*, 488 F. App'x 534, 535 (2d Cir. 2012) ("[Plaintiff] cannot maintain an action for a declaratory judgment without an underlying federal cause of action. . . . A prayer for relief, standing alone, simply does not satisfy the requirement that a case or controversy exist."); *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) ("[A] court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief.").[13] Accordingly, the Court declines

to issue the declaratory judgment sought and, as such, denies Hildegard's cross-motion for summary judgment in its entirety.

### D.  Ameriprise's Motion to Deposit Funds with a Discharge of Liability

Ameriprise has asserted a counterclaim for interpleader, pursuant to the Federal Interpleader Act, 28 U.S.C. § 1335. Ameriprise seeks to deposit the IRA proceeds with the Court, pursuant to 28 U.S.C. § 1335, with a discharge of liability, pursuant to 28 U.S.C. § 2361.

Interpleader is designed to "protect stakeholders from undue harassment in the face of multiple claims against the same fund, and to relieve the stakeholder from assessing which claim among many has merit." *Fidelity Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173, 177 (S.D.N.Y. 2002) (citing *Washington Elec. Coop. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993)). Interpleader actions normally proceed in two stages: first, the court "determines whether the interpleader action is appropriate and the stakeholder is entitled to bring the action," and second, the court determines "the rights of the competing claimants to the fund." *Id.*; *see also N.Y. Life Ins. Co. v. Apostolidis*, 841 F. Supp. 2d 711, 716-17 (E.D.N.Y. 2012) ("In the first step, the Court determines whether the jurisdictional requirements of Section 1335 have been met and, if it finds they have been, the Court discharges the plaintiff from liability. In the second step, the Court adjudicates the claims among the remaining adverse parties." (internal citations omitted)).

---

[13]  Plaintiff's argument that this case requires an interpretation of the IRC that only a federal court can provide is unpersuasive. (*See* Pl.'s Reply Mem. of Law in Supp. of Pl.'s Cross Mot. for Summ J. at 4-5.) As discussed *supra*, the IRC provisions cited by

plaintiff relate to tax qualification, and that is not at issue in this case.

As to the first stage, the interpleader statute applies only where there is "minimal diversity," *i.e.*, "where there are two or more adverse claimants, of diverse citizenship," *Union Cent. Life Ins. Co. v. Berger*, 10 Civ. 8408 (PGG), 2012 U.S. Dist. LEXIS 135102, at *19 n.9 (S.D.N.Y. Sept. 20, 2012) (alteration, citation, and internal quotation marks omitted), and when money or property worth $500 or more is involved, *see Feehan v. Feehan*, 09 Civ. 7016 (DAB)(THK), 2011 U.S. Dist. LEXIS 14047, at *9 (S.D.N.Y. Jan. 10, 2011). In addition, to determine whether an interpleader action is appropriate, a court must assess "whether the stakeholder legitimately fears multiple liability directed against a single fund, regardless of the merits of the competing claims." *Fidelity Brokerage Servs., LLC*, 192 F. Supp. at 178 (alterations, citation, and internal quotation marks omitted); *see also Marcus v. Dufour*, 796 F. Supp. 2d 386, 390 (E.D.N.Y. 2011) ("[T]he [interpleader] plaintiff must allege a real and reasonable fear of double liability or vexatious conflicting claims against the single fund, regardless of the merits of the competing claims." (internal citations and quotation marks omitted)). Finally, an interpleader plaintiff "must state that he has deposited or is depositing the fund with the court." *Marcus*, 796 F. Supp. 2d at 390.

Here, the Court finds that Ameriprise has satisfied all of the requirements of the first stage of an interpleader action. First, there is "minimal diversity" because Wendy is a citizen of California and both Hildegard and Blass are citizens of New York. Second, it is undisputed that the value of the proceeds in the IRA account has at all times exceeded $500.00. (Ameriprise 56.1 ¶ 22.) Third, Ameriprise is a neutral party that takes no position as to the proper disbursement of the IRA funds against the multiple and competing claims to those

funds – namely, the claims of Hildegard and Wendy. Finally, Ameriprise has requested permission to deposit the relevant funds with the Court.

However, the Second Circuit has held that "the availability of interpleader jurisdiction does not require its exercise, and the district court acts within its discretion to decline adjudicating issues raised in an interpleader action that can be 'fairly adjudicated' in state court." *Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997) (finding that district court did not err in applying discretionary standard when determining whether to abstain from adjudicating an insurance policy's coverage); *see also Truck-A-Tune, Inc. v. Re*, 23 F.3d 60, 63 (2d Cir. 1994) ("Interpleader is an equitable proceeding, and the District Court acted well within its discretion in determining that the equities did not warrant further federal court adjudication." (internal citation omitted)); *Am. Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990) (per curiam) ("[I]t is well recognized that interpleader is an equitable remedy, and a federal court may abstain from deciding an interpleader action if another action could adequately redress the threat that the stakeholder might be held doubly liable."). In so holding, the Second Circuit explicitly stated that the rationale underlying the Supreme Court's holding in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) – that the district court in that case properly abstained, as a matter of discretion, from hearing a case brought under the Declaratory Judgment Act where a parallel or concurrent action in state court was already proceeding – is "equally applicable to a claim for a declaration of non-coverage under an insurance policy raised in the context of a statutory impleader, as it is to a claim for declaratory relief raised in any other context." *Nat'l Union Fire Ins. Co.*,

16

108 F.3d at 21; *see also NYLife Distribs., Inc. v. Adherence Grp., Inc.*, 72 F.3d 371, 372 (3d Cir. 1995) (holding that "a motion to dismiss a federal statutory interpleader action during the pendency of a parallel state court proceeding is addressed to the sound discretion of the district court").

In *Wilton*, the Supreme Court explained that in determining whether to exercise such discretion, district courts should consider "whether the questions in controversy between the parties to the federal suit . . . can better be settled in the proceeding pending in the state court." 515 U.S. at 282 (internal citation and quotation marks omitted). In terms of factors to consider as part of this analysis, the *Wilton* Court pointed to the non-exclusive list of factors set forth in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942):

> (1) The scope of the pending state proceeding and the nature of the defenses available there; (2) whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding; (3) whether the necessary parties have been joined; and (4) whether such parties are amenable to process in that proceeding; (5) avoiding duplicative proceedings; (6) avoiding forum shopping; (7) the relative convenience of the fora; (8) the order of filing; and (9) choice of law.

*Glenclova Inv. Co. v. Trans-Resources, Inc.*, 874 F. Supp. 2d 292, 307 (S.D.N.Y. 2012) (citation omitted).

Given the proceedings that are pending in the Surrogate's Court of the State of New York, Nassau County, all of these factors

weigh in favor of abstention in this case.[14] The question of who is entitled to the IRA proceeds at the heart of the interpleader action is also one of the many issues before the Surrogate's Court, and in that sense, the interpleader action is parallel to the state proceeding. *See id.*; *see also Dore v. Wormley*, 690 F. Supp. 2d 176, 191 (S.D.N.Y. 2010) ("Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." (citation and internal quotation marks omitted)). The fact that the interpleader action "is merely a subset, rather than exact duplicate of the state court proceeding does not diminish [their] concurrent nature." *Glenclova Inv. Co.*, 874 F. Supp. 2d at 307 (citation and internal quotation marks omitted). Additionally, because both this Court and the Surrogate's Court are located in the same state, the fora are equally convenient for these parties. Finally, there is clearly a need to avoid the duplicative litigation that has already arisen in this case. Now that the Court has determined, as discussed *supra*, that ERISA does not govern Norman's assets, there is no reason why all remaining claims to the IRA cannot be adjudicated fully in the proceeding already ongoing in state court.

Thus, in its discretion, the Court abstains from exercising jurisdiction over Ameriprise's interpleader counterclaim and cross-claims (asserted against Hildegard, Wendy, and Blass). Accordingly, Ameriprise is not permitted to deposit the IRA proceeds with the Court, and the Court

---

[14] Indeed, in her moving papers, Wendy argues that "there are proceedings pending in New York Surrogate's Court, Nassau County in which the rights and obligations of the parties can and should be fully resolved." (Mem. of Law in Supp. of Wendy's Mot. for Summ. J. at 12.)

declines to discharge Ameriprise from liability pursuant to its interpleader claims.

### E.  Remaining State Law Claims

Wendy has filed two cross-claims against Blass, for breach of fiduciary duty and for declaratory judgment that he lacks standing to defend the testamentary trust created under Norman's last will and testament. Wendy has also filed a counterclaim against plaintiff for breach of contract.

Having determined, as discussed *supra*, that plaintiff's federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, 06-CV-6497T, 2007 U.S. Dist. LEXIS 41834, at *15 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over any remaining state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be

clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608 (WK), 2002 U.S. Dist. LEXIS 12842, at *11-12 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over Wendy's cross-claims against Blass and her counterclaim against Hildegard, and dismisses such state claims without prejudice.[15]

### F.  Attorneys' Fees and Costs

Each of the moving defendants (Fidelity, Ameriprise, and Wendy) seeks attorney's fees incurred in connection with this action. Plaintiff similarly claims that she is entitled to attorney's fees.

"A district court reviewing a claim under ERISA may, in its discretion, 'allow a reasonable attorney's fee and costs of action to either party.'" *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 137 (2d Cir. 2001) (quoting *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 138 (2d Cir. 2000)).

---

[15] To the extent Wendy's cross-claim against Blass regarding whether he has standing to defend the testamentary trust created by Norman's last will and testament seeks a declaration that Blass is not fit to serve as trustee in connection with this action, that claim is moot given the Court's dismissal of plaintiff's federal claims.

Under Section 1132(g)(1) of ERISA, a district court has "'discretion' to award attorney's fees 'to *either* party.'" *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2156 (2010) (quoting 29 U.S.C. § 1132(g)) (explaining that claimant need not be a "prevailing party" to receive attorney's fees pursuant to Section 1132(g)(1)). However, before a court may award attorney's fees to a claimant under 1132(g)(1), he or she "must show some degree of success on the merits." *Id.* at 2158 (citation omitted) (explaining that "[a] claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'pure procedural victory'" (alteration and citation omitted)).

Given that Hildegard has not achieved "some degree of success on the merits," the Court cannot award her attorney's fees in this action. *See id.*; *see also Katzenberg v. Lazzari*, 406 F. App'x 559, 563 (2d Cir. 2011) (finding that district court's decision not to award attorney's fees was not an abuse of discretion because plaintiff achieved no success on the merits).

Defendants, on the other hand, have prevailed on summary judgment. The Court, therefore, looks to the *Chambless* test used by courts in this Circuit to "channel[] their discretion when awarding fees under § 1132(g)(1)." *Levitian v. Sun Life & Health Ins. Co.*, 486 F. App'x 136, 141 (2d Cir. 2012) (alteration, citation, and internal quotation marks omitted) (explaining that, pursuant to *Hardt*, a court must first consider whether a fees claimant has shown "some degree of success on the merits," but then may apply the *Chambless* factors to determine whether to award fees); *Toussaint v. JJ Weiser, Inc.*, 648 F.3d 108, 110 (2d Cir. 2011) ("A court may apply – but is not required to apply – the *Chambless* factors . . . ."). The *Chambless* test consists of "five

factors: (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under the circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987).

As the Second Circuit has explained, the *Chambless* test will "very frequently suggest that attorney's fees should not be charged against ERISA plaintiffs." *Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir. 2000) (citation and quotation marks omitted). This "favorable slant toward ERISA plaintiffs is necessary to prevent the chilling of suits brought in good faith – the purpose of ERISA being to promote the interests of plan beneficiaries and allow them to enforce their statutory rights." *Id.* (quoting *Jones v. O'Higgins*, 736 F. Supp. 1243, 1245 (N.D.N.Y. 1990)); *see also Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 128-29 (7th Cir. 1991) ("[W]e must keep in mind ERISA's essential remedial purpose: to protect beneficiaries of pension plans. Adherence to this policy often counsels against charging fees against ERISA beneficiaries since private actions by beneficiaries seeking in good faith to secure their rights under employee benefit plans are important mechanisms for furthering ERISA's remedial purpose." (internal citation and quotation marks omitted)). "For this reason, when determining whether attorney's fees should be awarded to defendants, [courts] focus on the first *Chambless* factor: whether plaintiffs brought the complaint in good faith." *Toussaint*, 648 F.3d at 111.

Although Hildegard failed to prove any of her claims, the Court cannot conclude that her claims were frivolous or that they were made in bad faith. In essence, the Court concludes that Hildegard genuinely believed that Norman's plan was an ERISA plan (and that claims made pursuant to ERISA would be timely), and further believed that discovery would prove that theory. Moreover, overwhelming is the concern that awarding fees in a case like this will "deter beneficiaries and trustees from bringing suits in good faith for fear that they would be saddled with their adversary's fees in addition to their own in the event that they failed to prevail," thus serving to "undermine ERISA's essential remedial purpose of protecting beneficiaries of pension plans." *Salovaara*, 222 F.3d at 31 (citing *Gibbs v. Gibbs*, 210 F.3d 491, 505 (5th Cir. 2000)).[16] Accordingly, the Court also declines to award attorney's fees to defendants.[17]

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motions for summary judgment with respect to plaintiff's ERISA and IRC claims and denies plaintiff's cross-motion for summary judgment in its entirety. The Court declines to exercise jurisdiction over Ameriprise's interpleader counterclaim and cross-claims and, accordingly, does not permit Ameriprise to deposit funds with the Court and declines to discharge Ameriprise from liability pursuant to that interpleader claim. The Court also declines to exercise supplemental authority over Wendy's state law cross-claims – for breach of fiduciary duty and a declaratory judgment regarding whether Blass has standing to defend the testamentary trust – and Wendy's state law breach of contract counterclaim, and dismisses those claims without prejudice. Finally, the Court declines to award attorney's fees to any of the parties in this action. The Clerk of the Court shall close the case and enter judgment accordingly.


SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 26, 2013
    Central Islip, NY


\* \* \*

Plaintiff is represented by Amalia Goldvaser, Rachel Dara Nicotra, and Steven Jay Hyman of McLaughlin & Stern, LLP, 260 Madison Avenue, New York, N.Y. 10016. Fidelity is represented by Charles F. Seemann of Jackson Lewis LLP, 650 Poydras Street, Suite 1900, New Orleans, L.A. 70130, and Ana Shields of Jackson Lewis LLP, 58 South Service Road, Suite 410, Melville, N.Y. 11747. Ameriprise is represented by Michael J. Zaretsky of Chorpenning, Good, Carlet & Garrison

---

[16] The Court has also considered the other three *Chambless* factors – the ability of plaintiff to satisfy an award of attorney's fees, the relative merits of the parties' positions, and whether the action conferred a common benefit on a group of pension plan participants – and finds that they similarly do not weigh in favor of awarding defendants fees and, even if they did, do not outweigh the other factors cited above.

[17] Because, as discussed *supra*, the Court declines to exercise jurisdiction over Ameriprise's interpleader counterclaim, the Court similarly declines to grant Ameriprise attorney's fees against the interpleader fund or taxed against one of the parties, as requested. (*See* Ameriprise Br. in Supp. of Mot. for Summ. J. and to Deposit Funds at 21.)

Esqs., 645 Fifth Avenue, Suite 703, New York, N.Y. 10022 and Virginia T. Shea of Carlet, Garrison, Klein & Zaretsky, LLP, 1135 Clifton Avenue, Clifton, N.J. 07013. Wendy Perlman is represented by Phillip C. Landrigan of McCarthy Fingar LLP, 11 Martine Avenue, White Plains, N.Y. 10606. Jonathan Blass is represented by Craig A. DiPrima of The Law Office of Craig A. DiPrima LLC, 211 Oakwood Road, Huntington, N.Y. 11743 and Eric Wilen Penzer of Farrell Fritz, PC, EAB Plaza, 14th Floor, Uniondale, N.Y. 11566.